IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 17, 2025 Session

## BENJAMIN (ODZIANA) BOATMAN v. KARUNA CHAUDHARY ODZIANA

**Appeal from the Circuit Court for Williamson County**
**No. 23CV-140      Deanna B. Johnson, Judge**

_____

**No. M2024-00677-COA-R3-CV**

_____

A mother appeals the trial court's decision in this post-divorce modification action. We find no error in the trial court's decision to change the residential parenting schedule and to make the father the primary residential parent. We further find no error in the trial court's ruling making the father the sole decision-maker on non-emergency medical care and educational matters. However, we reverse the trial court's ruling that neither parent could obtain a passport for the children or take them out of the country. Further, we vacate and remand the trial court's decision on the residential parenting schedule for failure to make a specific provision for holiday parenting time.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, Vacated and Remanded in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

Adam A. Zanetis, Franklin, Tennessee, for the appellant, Karuna Chaudhary Odziana.

Michele L. McGill, Franklin, Tennessee, for the appellee, Benjamin (Odziana) Boatman.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

This is a post-divorce modification action involving Benjamin Boatman ("Father") and Karuna Chaudhary ("Mother") regarding the residential parenting plan for their two children, Amber (age 15) and Gwen (age 11).

The original complaint for divorce was filed in January 2014, and the parties were divorced in March 2017 by the Davidson County circuit court. Under the original permanent parenting plan, Mother was designated the primary residential parent, with 213 days of parenting time, and Father had 152 days of parenting time. Mother was given primary decision-making authority regarding educational and non-emergency healthcare decisions. The parenting plan specified that, "If either parent wishes to take either minor child to a counselor/therapist[,] it must be approved by the court." The divorce proceedings were marked by a high degree of conflict, with subsequent petitions and motions addressing various matters, including child support, parenting time, and disagreements over parenting decisions.

In February 2022, Mother filed a motion to approve counseling for the children. She alleged that Father had "alienated the affections of the children from Mother" and that, after Mother told Amber that Gwen had received the COVID vaccine, Amber made several suicide threats. Father opposed the motion and asserted that Mother was "attempting to alienate the Father from the children" and that the alleged events involving Amber were "likely the result of the Mother's inability to properly supervise the children."

The current appeal arises out of a petition to modify the permanent parenting plan filed by Mother in March 2022 and Father's answer and counter-petition.[1] In her petition, Mother alleged that "Father's ill conduct and wanton disregard for the children's psychological wellbeing" required a change in the parenting plan. As part of her petition to modify, Mother requested sole decision-making authority regarding non-emergency health care, including taking the children to a therapist or counselor. In his counter-petition, Father asserted that there had been a material change in circumstances by virtue of Mother's alleged inability to "properly care for or control the minor children" and that he was "better equipped to care for the emotional needs and developmental level of the children" due to Mother's conduct when the children were in her home.

The trial court granted Mother's motion to approve counseling for the children in an order entered on April 5, 2022. The order stated that the children would have counseling with Dr. Janie Berryman and that Mother would schedule an intake appointment for the children within 30 days. The parties were enjoined from discussing the COVID vaccine or the pending litigation with the children.

On April 14, 2022, Father filed a motion to allow the children to choose their religion, including the choice to be baptized. According to the motion, Father had been taking the children to a Greek Orthodox church during his parenting time, and they had expressed interest in being baptized. On April 15, 2022, Mother filed a motion for criminal contempt, asserting that Father had violated the court's April 5, 2022 order by discussing

---

[1] Father also filed a petition for criminal contempt, which was dismissed by the trial court and is not at issue in this appeal.

the court proceedings and the COVID vaccine with the children. The court heard both the motion about religious choice and the contempt motion on April 29, 2022. In an order entered on May 16, 2022, the court stated that the parties would "jointly attend to the needs of the children's religious upbringing" until the court made a determination at the final hearing. The court further found that Mother's contempt motion was premature and ordered the parties to attend mediation. Mother subsequently withdrew her contempt motion.

Father filed a petition for criminal contempt in October 2022 alleging that Mother was guilty of contempt for the following actions: (1) violating the permanent parenting plan by refusing to go to mediation to address disagreements that had arisen concerning the children's religious upbringing, (2) violating the court's June 6, 2022 order requiring the parties to attend mediation on September 13, 2022, (3) violating the permanent parenting plan's provisions regarding calls and communications between the parents and the minor children, (4) violating the parental bill of rights included in the permanent parenting plan, and (5) making fraudulent statements to the court regarding her work-related child care expenses.

The parties attended mediation on October 25 and 27, 2022, and executed an agreed order resolving the issues in the modification proceedings, with the exception of the baptism of the children. On October 28, 2022, Father filed a Notice of Repudiation and Objection to Entry of Agreed Order and Permanent Parenting Plan in which he "repudiate[d] his previous consent to entry of the Permanent Parenting Plan entered into by agreement of the parties on October 27, 2022." He asserted that Mother had made fraudulent statements to him regarding her income and that he now had "reason to believe that the Mother is working a second job." Father further stated that a term regarding transportation of the children to and from school "was inadvertently omitted" from the agreed parenting plan.

On December 12, 2022, Mother filed an Emergency Motion for Custodial Evaluation and to Suspend Father's Parenting Time Pendente Lite. She requested that the court order the parties and the minor children "to undergo a custodial evaluation at Father's expense" and temporarily suspend Father's parenting time until the custodial evaluation and further order of the court. In her motion, Mother asserted that the minor children were "suffering irreparable psychological and emotional harm due to Father's words and actions and require this Court's immediate intervention." Mother submitted an affidavit in which she described troubling recent events, including threats of suicide and violence against Mother by Amber. The trial court denied Mother's request for an ex parte restraining order.

On December 29, 2022, Mother filed a motion to set the competing petitions for modification of the permanent parenting plan for final hearing. Father responded in opposition to Mother's motion to set and moved the court to allow him to amend his counter-petition to include a prayer for modification of child support. The court thereafter

entered an agreed order allowing Father to amend his counter-petition, and Father filed a timely amended counter-petition.

On March 2, 2023, Father requested that the action be transferred to the Circuit Court of Williamson County pursuant to Tenn. Code Ann. § 36-5-3003(b) on the basis that, for over six months, neither of the parties had resided in Davidson County. The Davidson County court clerk transferred the case to Williamson County on March 21, 2023. Mother filed a motion in Williamson County circuit court on April 29, 2023, for the matter to be set for final hearing. The court entered an order on September 20, 2023, setting all pending matters for final hearing over three days in January 2024.

On September 11, 2023, Mother made a motion asking the court to approve an alternative counselor for the children. According to the motion, the Family Care Center would be closer to Mother, who was taking the children to their therapy sessions, and would be covered by Mother's health insurance. At a hearing on September 26, 2023, Mother presented a letter from Dr. Berryman concerning the children's need to see a counselor not related to the litigation. Father argued that the children did not need to see another counselor and requested the postponement of the court's decision so that Amber could testify. The court reset Mother's motion for November 7, 2023, and instructed Father to contact two other specific therapy providers about their availability and insurance coverage.

Father filed a motion on October 25, 2023, asking the court to suspend Mother's parenting time pendente lite. Father asserted that the action was necessary to protect the children from "further retaliatory abuse following A.O.'s testimony at the pre-trial hearing and/or at trial."

At the hearing on November 7, 2023, the court considered Mother's motion regarding an alternative counselor and Father's motion to suspend Mother's parenting time. Dr. Berryman testified about her interactions with the children. She opined that Amber "did not have an intent to harm herself" when Dr. Berryman spoke with the child about her previous threats. Dr. Berryman had reviewed information sent by Father to the children about the COVID vaccine and characterized the videos as "fear-mongering." When asked by the court, Dr. Berryman opined that it would be appropriate for the parents to be evaluated for parental alienation. Dr. Berryman stated that Amber talked back to Mother "horribly" and became increasingly angry when Mother tried to impose consequences for the disrespectful behavior. Father had not had any contact with Dr. Berryman, and the children would not talk to her about Father. She believed that the children's resistance was attributable to her connection with the court proceedings and felt that they would benefit from seeing a therapist who had no connection to the court. Father withdrew his motion to suspend Mother's parenting time. Based upon the proof, the court entered an order granting Mother's motion for an alternative counselor and ordering Mother to enroll them for counseling at Mercy Community Healthcare. The court further ordered that Mother could

select Dr. Katie Spirko or Tracy Steyer to talk to the parties and the children "to determine whether there has been parental alienation." The parties were to evenly divide the costs of the counseling and the parental alienation evaluation.

On January 2, 2024, the day before the trial began, the court entered an agreed order relieving the parties of the court's previous order regarding a parental alienation evaluation "as the parties have stipulated that the evaluation of Dr. Spirko could not be completed prior to trial and Ms. Steyer is not licensed to do such an evaluation." The parties also stipulated in an agreed order that the transcript of Dr. Berryman's testimony from the November 7, 2023 hearing would be considered as proof during the trial.

The case was tried over three days in January 2024. The court heard proof on Father's contempt petition and dismissed the petition. On the modification petitions, the court heard testimony from Mother, Amber, Father, and Father's girlfriend. Both attorneys were permitted to read into the record and highlight portions of the transcript of Dr. Berryman's previous testimony. After hearing all of the proof, the court took the matter under advisement.

Trial court decision

In a memorandum and order entered on February 2, 2024, the trial court made extensive findings of fact. We will summarize portions of the court's findings that are particularly pertinent to this appeal. (All quotations are from the court's memorandum opinion.) The court made findings concerning Mother's and Father's religious upbringing and current beliefs. Mother was born and raised in India as a Hindu and remained a practicing Hindu throughout the marriage. Father "was agnostic most of his life" and had recently become a Christian and, at the time of the hearing, was an active member of an Eastern Orthodox church. The children, while in Father's care, had been attending church with Father, and "they enjoy going to church with him." The court found that "Father has never objected to the children practicing the Hindu faith and has never prohibited such a practice."

The court further found:

> In 2021, the parties' children began telling Mother they were going to a Christian church with Father. Mother testified that she was fine with the children attending the Christian church; however, Mother later was upset when the children told Mother they were going to get baptized in the Christian church. Mother does not want the children baptized because she believes they are too young to make the decision.
> . . . .

Mother believes that, since the children have been learning about Father's Christian faith, the children have been less willing to do the Hindu prayers. However, Mother had no proof to back these beliefs.

The relationship between Mother and the oldest daughter, Amber, was a major issue at trial. The trial court found as follows:

The parties' oldest child, Amber, and Mother have a terrible relationship. Mother believes the relationship began to deteriorate a couple of years ago when Amber was twelve. Mother suspects the problems began when Mother first expressed her desire to have the children get the COVID shot. Amber had asked each of her parents for information on COVID[,] including the shot. Father sent Amber links to news clips in response to her requests for information. These news clips, which were played in court, are reports of young people collapsing unexpectedly in different situations. There is no detail about why the young people collapsed, whether the collapses were due to COVID, or whether the collapses were due to the COVID shot. . . Amber forwarded these news articles to Mother. Amber and Mother tried to discuss COVID and the pros and cons of the COVID shot. However, their discussion attempts only ended in very heated arguments. Amber feels Mother did not listen to her thoughts and positions about COVID and merely shut her down.

Audio recordings were played in court revealing arguments between Mother and Amber. The vitriolic and disrespectful way in which Amber speaks to Mother is shocking and is emblematic of the poor quality of their relationship. Amber claims Mother nags her and pushes her to the brink and causes her to speak in such hostile fashion to Mother. Mother denies doing this; the Court finds Amber credible on this issue. However, the Court does not condone the way Amber speaks to Mother.

The court addressed Mother's suspicion that Father was "turning Amber against Mother" and concluded that there was not "sufficient proof to show Father has done anything to turn Amber against Mother." The court found no proof to show that Amber's behavior was "anything more than a typical pre-teen/teenage daughter's behavior toward her Mother." Furthermore, the court found that Mother's conduct had "only exacerbated the problem" and cited specific evidence:

For example, Mother interrupts and times Amber's telephone calls with Father. Mother blocked Father's family from calling or texting with Amber and requires they seek Mother's permission before doing so. Mother berates Amber about completing homework assignments even though Amber has great grades. Mother fails to discipline Amber when necessary for fear of

what Amber will tell Father. Also, Mother fails to listen to Amber and her side of any discussion. Amber does not behave this way while in Father's care.

The court emphasized that "all other aspects of Amber's life are going well."

The issue of counseling for Amber was a point of contention between Mother and Father. According to Mother, Amber asked to see a counselor for anger problems in January 2022. Amber admitted having anger problems but denied asking to see a counselor. The court found Amber "more credible on this issue and finds this is one of many examples of Mother not being candid with the Court." The court's findings continued as follows:

Also, Mother testified that, on January 10, 2022, Amber "attempted suicide by jumping out the window."[2] However, Amber's diary entries reveal Amber threatened to jump out the window and did not actually jump. This is another example of Mother not being candid with the Court. After Amber learned Mother had gotten the COVID shot for Gwen, Amber put a knife to her neck saying she wanted to commit suicide. Mother reached out to Father about counseling. Father discussed the matter with Amber who denied being suicidal. Father told Mother Amber was not suicidal and did not need a counselor. Father was very hesitant for Mother to take Amber to counseling because, during the divorce years earlier, Mother made false allegations that Father sexually abused Amber and took her to a counselor to address alleged abuse. Mother's actions in making and pursuing these false allegations against Father caused the judge presiding over the parties' divorce, the late Honorable Phillip Smith, to enter an order requiring any party who wanted to put the children in counseling to seek permission from the court before doing so. . . .

Months later, Mother provided Amber's diary entries to Father in discovery. Father saw that Amber had written in her diary that she had threatened suicide. Father again addressed the suicide matter with Amber and she admitted to making the threats but said she did not mean it and would have never followed through. Father told Amber "suicide is a permanent solution to a temporary problem."

Father testified he is not against counseling for the children. . . . Father admits he did not contact Dr. Berryman to give his input or to request a status of the children's counseling. Father explained he did not think it was

_____

[2] We note that English is not Mother's first language. Based on the transcript alone, this Court would interpret Mother's testimony to mean that Amber threatened to attempt suicide by jumping out of a window. However, this is only one among many instances in which the trial court found Mother not credible.

- 7 -

appropriate to do so because Judge Smith had ordered Mother to take the children to counseling. The Court finds Father credible on this issue. Furthermore, the Court notes Dr. Berryman did not try to contact Father.

Mother asserted that Father had refused to take Amber to a wellness visit because of a mask requirement. Father stated that he did not take the children to the appointment in question because he did not want to interrupt a visit with his parents, who were visiting. The trial court chastised Father for refusing to take a few hours out of his parents' ten-day visit to take Amber to the doctor. The court further found "Father credible on this issue and finds Mother's testimony that Father refused to take Amber to the doctor because of a mask requirement is another example of Mother not being candid with the Court." In addition, the court considered Mother's scheduling of the appointment during Father's parenting time to be "an example of Mother constantly interfering with Father's parenting time" and an example of "Mother's unwillingness to foster a good relationship between Father and the children."

Another incident that was at issue in the case occurred on November 10, 2022. The court made the following findings:

Mother and both children were sick. Mother had tested positive for COVID with an in-home test and Gwen had slept in the bed with Mother. Mother told Father he should just take Amber and Mother would bring Gwen later when she was feeling better. Mother testified Father agreed to this plan. However, on cross-examination, Father presented a text message in which he told Mother he disagreed with the plan. This is another example of Mother not being candid with the Court. Father requested a medical note of proof of Mother's COVID, which is required by court order. Mother scheduled an appointment with a medical provider via telehealth for 4:00 p.m.—the very time Father was supposed to pick up the children for his parenting time. Mother admitted she was not going to provide the requisite proof until after the pick-up time, which is a violation of the court order. Mother testified she told Amber of this plan and told Amber Father had agreed to it, which was not true. Mother testified "Amber agreed." The fact that Mother wanted Amber's approval of the plan is quite telling of the relationship between Mother and Amber. Later Amber was packing Gwen's belongings, holding Gwen's hand, and leading her out the door. Mother said, "No, Gwen is staying." Mother claimed Amber began to hit her and forcibly take Gwen. Father was waiting in the car, which is required by court order. Mother claimed Amber went to Father's car, put her belongings in it, returned to the house, and went back and forth. Mother and Amber began to fight about Gwen staying with Mother rather than going with Father for his parenting time. The Court finds both Mother and Amber were in the wrong in how they

handled this matter. However, Amber was twelve years old at the time and Mother was, of course, a grown woman.

The trial court's order contains numerous credibility findings and other factual findings adverse to Mother. We will not include all of these findings in this summary, but only those deemed most relevant to this appeal. The trial court found Father credible on the issue of the circumstances surrounding his repudiation of the parties' mediated agreement. Father's explanation was that his lawyer "learned within hours of the mediation that the income Mother presented at the mediation was not accurate." The court found Mother's portrayal of the "situation in court is another example of Mother's failure to be candid with the Court." The court found Mother's request for a 120-day period in which Father would have limited contact with the children (so that Mother and Amber could work on healing their relationship) to be "an example of Mother's unwillingness to foster a good relationship between Father and the children and, instead, reveals Mother's desire to intervene in that relationship." As to Mother's request for permission to obtain passports for the children, the trial court emphasized "Mother's testimony that her only relative in India is her mother knowing her sister lives there as well" and found this to be "another example of Mother's dishonesty with the Court." After Father presented evidence to contradict Mother's contention concerning a cell phone Father gave to the children, the court found this was "yet another example of Mother's serious lack of credibility."

The COVID vaccine was a major point of contention between the parties. Mother wanted the children to be vaccinated, but Father disagreed "because of the lack of information about it and the controversy surrounding it, especially for children." Nevertheless, Mother had Gwen vaccinated. The trial court found that "Mother lied to Gwen and told her it was a flu shot. Mother justifies the lying because she has lied about other medicine when the children were small, telling the children it was candy."

Both parties testified about a confrontation that occurred on February 10, 2022, when Father picked Amber up at Mother's house and was scheduled to "get Gwen later after she got off the school bus." When Father and Amber came to pick up Gwen, Father attempted to return Amber's phone to Mother, and a disagreement occurred over whether Mother was going to see Gwen. Father made an audio recording of the event. The trial court found that "Mother's testimony that Father had put the recorder in her face, there had been a confrontation, and people had been offering to call the police, despite clear evidence to the contrary, is another example of Mother's dishonesty with the Court."

On September 28, 2023, Father was waiting to pick up the children at Mother's house, and Amber informed Father that she and Mother were in a disagreement over Father's phone, which Amber had been taking to Mother's house. Mother wanted Amber to unlock the phone before Mother would return the phone to Amber. There was a confrontation between Mother and Father. Mother refused to return the phone, and "Father called the police to have Mother charged with theft of property." The court found that

"[t]his is yet another example of the [dysfunction] in this family and Mother's conduct causing most of the [dysfunction]."

In its findings, the court referenced Dr. Berryman's previous testimony, which was submitted as proof at trial, and stated that "Dr. Berryman testified she merely has suspicions and has no actual opinions" about the issue of parental alienation. The court also made the following findings regarding Dr. Berryman's testimony:

> Dr. Berryman discussed the fear mongering of COVID and testified most children do not pay attention to it. However, the Court finds that assertion not credible. Moreover, Dr. Berryman failed to mention that Mother had tried to keep Gwen at home because Gwen slept in the bed with Mother at a time Mother thought she had COVID. Dr. Berryman also failed to discuss the effect of Mother lying to Gwen about the COVID shot and duping her into getting the shot. Additionally, Dr. Berryman did not attempt to contact Father and speak with him about family matters.

The court generally credited Amber's testimony, including Amber's statements that her opinions about COVID "come from her own observations" and that, "if Father had a positive view of the COVID shot, she would not change her mind." The court noted that Mother sent Amber a text message that Gwen had received the COVID vaccine. Amber's response was to "put a knife to her throat and threaten[ ] suicide 'to make a point' to Mother." The fact that Mother had told Gwen she was getting a flu shot contributed to Amber's distrust of Mother. Amber testified that she had tried to discuss the COVID vaccine with Mother, but she "felt like Mother was not listening to her or letting her talk."

When a Department of Children's Services ("DCS") caseworker spoke with Amber at school, Amber stated that "Mother had slapped her on her face with an open hand on at least three occasions." Amber expressed her desire to "be at Father's house more" and stated that she felt "more respected, loved, and is closer to Father." Amber admitted to hitting Mother but claimed she did so only in self-defense. She further "admits she has picked Father's side in the battle between her parents and advised Gwen to pick a side."

In its order, the court found a material change of circumstances based upon the family dysfunction and "the extremely poor relationship between Mother and Amber." The court found that these material changes impacted the best interests of the children. After examining the relevant statutory factors, the court modified the permanent parenting plan to make Father the primary residential parent with a week-on/week-off schedule. Further, the court gave Father sole decision-making authority on non-emergency medical matters and educational decisions. As to religious matters, which were not addressed in the original parenting plan, the court gave the parents equal decision-making authority. The court stated that "Mother is free to pursue reunification counseling between her and Amber" and that "this is the only type of counseling Mother is permitted to pursue for either child without

court approval." Neither party was permitted to obtain passports for the children. Father was awarded a refund of child support he had paid since the filing of the petition to modify, and Mother was ordered to pay child support to Father back to the same date.

On March 11, 2024, the trial court entered an order stating that Mother owed Father a total of $11,464.00 for his overpayment of child support and Mother's underpayment of child support. The same day, the court entered a permanent parenting plan order.

In response to post-trial motions filed by the parties, the court entered an order on April 11, 2024, awarding Father $30,000 in attorney fees. Mother appeals.

Mother raises the following issues on appeal: (1) whether the trial court erred in changing custody and the parenting schedule as to both children; (2) whether the trial court erred in awarding Father sole decision-making authority as to educational decisions and non-emergency health care decisions; (3) whether the trial court erred in restricting both parents' ability to obtain passports for the children and to take the children out of the country; (4) whether the trial court erred in failing to designate holiday parenting time; (5) whether the trial court erred in its provision concerning the children's practice of their preferred religion; (5) whether the trial court erred in awarding Father $30,000 in attorney fees; and (6) whether Mother is entitled to attorney fees and costs incurred on appeal. Father raises the additional issue of whether he is entitled to his attorney fees and costs on appeal.

STANDARD OF REVIEW

In a non-jury case, we review the trial court's factual findings de novo upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review the trial court's conclusions of law de novo, with no presumption of correctness. *Armbrister*, 414 S.W.3d at 692. Moreover, absent clear and convincing evidence to the contrary, we will not reevaluate a trial court's witness credibility assessments. *Easley v. City of Memphis*, 699 S.W.3d 268, 270 (Tenn. 2024).

In cases involving child custody and parenting plans, our scope of review is limited. *In re Gabby G.*, No. M2024-00541-COA-R3-JV, 2025 WL 2335851, at *5 (Tenn. Ct. App. Aug. 13, 2025) (citing *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017)). Because trial judges "are in a better position to observe the witnesses and assess their credibility," "trial courts enjoy broad discretion in formulating parenting plans." *C.W.H.*, 538 S.W.3d at 495.

An appellate court will not overturn a trial court's ruling formulating a parenting plan merely because reasonable minds might reach a different decision. *Id.* We review a trial court's decision regarding parenting schedules under the abuse of discretion standard. *Id.* A trial court abuses its discretion when it "'appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or

- 11 -

relies on reasoning that causes an injustice.'" *Armbrister*, 414 S.W.3d at 693 (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)). In the context of establishing a residential parenting schedule, a trial court abuses its discretion when its ruling falls outside the range of "'rulings that might reasonably result from an application of the correct legal standards to the evidence.'" *Id.* (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)).

ANALYSIS

I.      Modification of custody and the parenting schedule

The central issue on appeal is whether the trial court erred in modifying the parenting plan to make Father the primary residential parent (i.e., to change custody) for both children.

Modification of custody requires a two-step process. *Taylor v. Taylor*, No. M2024-00045-COA-R3-CV, 2025 WL 899792, at *5 (Mar. 24, 2025) (citing *Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007)). The court must first determine whether there has been a material change of circumstances since the establishment of the current parenting plan. *Id.* If so, the trial must then proceed with determining whether modification is in the child's best interest. *Id.* Whether a material change in circumstances has occurred and whether modification of a parenting plan is in the child's best interests are factual questions. *Id.* at *6. We therefore presume the trial court's findings on these matters are correct and will not overturn them absent evidence that preponderates otherwise. *Id.* (citing *Armbrister*, 414 S.W.3d at 692).

a.   Material change of circumstances

The analysis required to determine whether a material change in circumstances has occurred depends on whether a parent is seeking to modify custody or to modify the residential parenting schedule. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). Modification of custody requires a higher threshold than that required for modification of a residential schedule. *Hawk v. Hawk*, No. E2015-01333-COA-R3-CV, 2016 WL 901518, at *9 (Tenn. Ct. App. Mar. 9, 2016). The section of the statute applicable in this case provides that:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

- 12 -

Tenn. Code Ann. § 36-6-101(a)(2)(B)(i). Not every change in circumstances constitutes a material change. Rather, "'[t]he change must be significant before it will be considered material.'" *Gentile v. Gentile*, No. M2014-01356-COA-R3-CV, 2015 WL 8482047, at *5 (Tenn. Ct. App. Dec. 9, 2015) (quoting *In re T.C.D.*, 261 S.W.3d 734, 744 (Tenn. Ct. App. 2007)).

There is no bright-line test for courts to use when determining whether a material change in circumstances has occurred. *McClain v. McClain*, 539 S.W.3d 170, 188 (Tenn. Ct. App. 2017). Courts consider the following principles in making this determination:

> "First, the change of circumstances must involve either the child's circumstances or a parent's circumstances that affect the child's well-being. Second, the changed circumstances must have arisen after the entry of the custody order sought to be modified. Third, the changed circumstances must not have been reasonably anticipated when the underlying decree was entered. Fourth, the change in circumstances must affect the child's well-being in some material way."

*Canzoneri v. Burns*, No. M2020-01109-COA-R3-CV, 2021 WL 3399860, at *6 (Tenn. Ct. App. Aug. 4, 2021) (quoting *McClain*, 539 S.W.3d at 188) (citation omitted).

Here, the trial court found two material changes in circumstances: the substantial family dysfunction and "the extremely poor relationship between Mother and Amber." There is no dispute as to the poor relationship between Mother and Amber. As to the family dysfunction, Mother objects to the trial court's statements regarding her decision to get the COVID vaccine for Gwen. The specific statements at issue appear in a paragraph in which the trial court gave examples of the family dysfunction:

> Also, Mother ignoring Father's request to not get the children the COVID shot until more research was done or at least until the parties could discuss it is another example of the severe [dysfunction] in this family as well as Mother lying to Gwen about the shot and telling her it was the flu shot.

As Mother correctly points out, she had sole decision-making authority with respect to non-emergency healthcare decisions under the parenting plan in effect at that time. Gwen was eight years old when Mother and the child's pediatrician decided to give her the COVID vaccine. Mother asserts that "the trial court unreasonably holds this against Mother, and it is one of the deciding factors in the trial court's Memorandum and Order as to material changes and the best interest analysis." While we may tend to agree with Mother regarding the trial court's concern regarding this incident, the trial court cited numerous other examples to justify its finding that family dysfunction constituted a material change in circumstances. The trial court identified multiple instances in which the parents' hostility

- 13 -

toward one another interfered with their ability to act in their children's best interests, including the following: fighting about which parent would get Gwen off of the school bus, Mother requesting a schedule change in front of Gwen and then making a snide comment when Father refused the change, ongoing disputes about the children bringing telephones to the other parent's home and resorting to having separate phones, Mother interrupting and timing the children's telephone calls with Father, Father recording Mother when he was picking Gwen up, Father calling the police to secure the return of his telephone from Mother, and Mother lying to Amber that Father had agreed to a schedule change. There is ample evidence to support the trial court's conclusion regarding substantial family dysfunction.

While acknowledging the dysfunction in her relationship with Amber, Mother objects to the trial court's statement that "Mother has not submitted any proof that Father is at fault." After making that statement, the court continued as follows:

> Indeed, the text messages produced by Father in court indicate Father encourages Amber to be respectful of Mother. Instead, the Court finds Mother and Amber are to blame for the downfall of their relationship and, again, Amber is a child while Mother is an adult. When Mother learned Amber could not go on the trip out west because she did not have the COVID shot, Mother decided to take only Gwen rather than finding a different trip so she could include Amber. This action appeared to the Court to be Mother's way of punishing Amber for not getting the shot and it certainly added fuel to the fire of their relationship. Also, Mother told Amber she must pray Hindu prayers if she is going to pray Christian prayers. This made Amber feel forced to practice [Hinduism]. In addition, Mother interrupts and times Amber's conversations with Father. Mother declared Father and his family could no longer contact Amber directly and would have to go through Mother to communicate with Amber. Mother read Amber's diary and now Amber no longer feels comfortable using diary therapy. When Father called Mother to tell her Amber had expressed a desire to spend more time with Father and for him to have custody, Mother merely responded, "Amber is crazy," rather than investigate why Amber had these feelings. When Amber told DCS Mother had slapped her in the face on several occasions, Mother got mad at Amber and told her she had broken Mother's trust. These are just some of the examples of the abysmal relationship between Mother and Amber.

Mother disagrees with the trial court's finding that she (and Amber) were to blame for their strained relationship. She asserts that, "Mother submitted significant proof at trial that Father at least in part contributed to the dysfunction between Amber and Mother." Mother cites information concerning the COVID vaccine that Father gave to Amber, some of which discussed the death of children. She argues that the trial court erred in failing to find a correlation between those materials and Amber's strong views against obtaining the

- 14 -

COVID vaccine. The advisability of giving the COVID vaccine to the children was a major point of disagreement between Mother and Father. The trial court credited the testimony of Amber and Father, and not Mother's testimony, concerning the source of Amber's views on the matter. Amber testified that her opinions concerning COVID came from her own research and that she solicited information from both parents. Amber further did not feel that Mother would listen to Amber's opinions about the COVID shot. Mother has not identified any basis, much less clear and convincing evidence, to justify overturning the trial court's credibility determinations. While another court might agree with Mother's assertion that "Father was at least partially at fault for the deterioration of Mother and Amber's relationship," such a finding would not justify a conclusion different than the trial court concerning whether there was a material change of circumstances necessitating a change in custody.

Mother also argues that the trial court erred in choosing "not to give credence to the children's counselor, Dr. Janie Berryman, who stated on the topic of these [COVID] materials being sent to Amber, 'I saw it as fear mongering quite a bit.'" The trial court addressed and explained its views concerning Dr. Berryman's testimony and specifically found that the fear-mongering statement was not credible. Mother fails to cite clear and convincing evidence justifying a reversal of the trial court's credibility determination.

After arguing that the trial court's finding of a material change in circumstances was not supported by the evidence, Mother proceeds to state: "While Mother can stipulate that her relationship with Amber at the time of trial was dysfunctional and that a material change may have existed as to Amber, there are far fewer facts indicating that a material change of circumstance occurred regarding Gwen." We respectfully disagree. The trial court specifically found that "the severe [dysfunction] in this family and the terrible relationship between Mother and Amber are material changes in circumstances impacting the best interests of both children." The trial court proceeded to give facts supporting this conclusion, including an instance where "Mother and Amber were fighting about Gwen going to Father's house and both Gwen and Amber were crying hysterically." Mother points to evidence, including testimony from Dr. Berryman, that Amber was pressuring Gwen to pick sides in the conflict between Mother and Father. The trial court expressly credited Amber's testimony that she advised Gwen to side with Father.

With respect to the first step of the modification process, the existence of a material change in circumstances, the evidence does not preponderate against the trial court's conclusion that there had been a material change in circumstances with respect to both children.

b. Best interests

In the second step, the trial court had to determine whether modification of the parenting plan was in the child's best interests. In its decision, the trial court went through

a thorough examination of the statutory best interest factors found at Tenn. Code Ann. § 36-6-106(a).[3] We will quote the factors and then examine Mother's arguments as to each one.

Factor (1) considers "the strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child[.]" Tenn. Code Ann. § 36-6-106(a)(1). For this factor, the trial court found that the "strength, nature, and stability" of Amber's relationship with Mother was "extremely poor." The court found that "Gwen's relationship with Mother is not good and worsening, primarily because of the demise of the relationship between Mother and Amber." The court noted Amber's testimony that "Mother treats both girls, and especially Gwen, like babies." As to Father, the court found that the children's relationships with him were "very good." The court noted that Amber had an "especially close" relationship with Father and had requested to spend more time with Father. The trial court acknowledged that Mother had performed the majority of the parenting responsibilities to meet the children's daily needs because Mother had had more parenting time since the divorce, when the children were "very young."

Mother objects to the trial court's "pattern of honing in on the deterioration of Amber and Mother's relationship" in its analysis of the factors. She asserts that "the overall best interest analysis should be much closer between the parties, but the trial court favored Father almost entirely." Mother takes the position that the trial court "should have found that this factor favored Mother in large part, at least as it comes to Gwen," and asserts that there was "no justification for changing the schedule or primary parent status as it relates to Gwen."

Mother disagrees with the trial court's weighing of the evidence. As previously noted, the trial court made numerous credibility findings adverse to Mother in this case, and those credibility determinations were crucial to many of the trial court's factual findings. Absent clear and convincing evidence, we cannot reevaluate those credibility assessments. *Wells*, 9 S.W.3d at 783. The trial court was able to observe the witnesses' demeanor and was in "the most favorable position to resolve factual disputes hinging on credibility determinations." *Id.*

Mother correctly observes that the trial court found her "less credible than Amber" at some points in its decision. For example, Mother cites the following finding by the court: "Amber claims Mother nags her and pushes her to the brink and causes her to speak in such a hostile fashion to Mother. Mother denies doing this; the Court finds Amber credible on this issue." Mother emphasizes that Amber was fourteen years old at the time of the hearing and that Mother introduced "significant evidence" that "Amber was engaging in

---

[3] Like the trial court, we apply the best interest factors in effect at the time of the filing of the petitions to modify custody.

extraordinarily concerning behavior," such as deleting information from Mother's phone, "sneaking a phone into Mother's home without permission, cursing at Mother, being physical with Mother, discussing litigation with Father, making suicidal threats when she did not get her way, and manipulating Gwen to turn [her] against Mother." Based upon this evidence, Mother argues, the trial court erred in giving "such deference" to Amber. The trial court discussed all of the facts cited by Mother in its decision and did not condone or approve of Amber's behavior. The trial court found, however, that Mother's conduct was detrimentally affecting Amber's relationship with Mother. The evidence does not preponderate against that finding.

Mother likewise objects to the trial court's findings that Father was more credible than Mother as to certain matters. In particular, Mother cites the following statement by the trial court, which appears in its factual findings:

Father admits he did not contact Dr. Berryman to give his input or to request a status of the children's counseling. Father explained he did not think it was appropriate to do so because Judge Smith [the judge who issued the initial order regarding counseling] had ordered Mother to take the children to counseling. The Court finds Father credible on this issue.

Mother disagrees with Father's interpretation of the operative trial court order regarding counseling and emphasizes that Father explained to the children "that they had been court ordered to attend counseling with Dr. Berryman." Mother continues: "Subtle though it may be, Father is not credible in this instance because he claims that he does not believe he can talk to the actual counselor, but he has no problem talking about counseling with the children directly." Mother's assessment of the logic of Father's explanation fails to provide this Court with a reason to second-guess the trial court's assessment of Father's credibility as a witness.

We agree with Mother's statement that "the evidence, in large part, shows that Mother is extraordinarily dedicated to both children." Both parents in this case have shown dedication to their children, as well as behaviors and attitudes toward the other parent that are harmful to their children. The trial court was tasked with determining what custody and parenting schedule would serve the best interests of each child. The evidence does not preponderate against the trial court's findings with respect to factor (1) of the best interest analysis.

Factor (2) states:

Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents,

consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

*Id.* § 36-6-106(a)(2). We will quote the trial court's entire analysis regarding this factor:

Father has the ability and potential to perform parenting responsibilities for both children. The caustic and vitriolic relationship between Amber and Mother is making it difficult, if not impossible, for Mother to perform her parenting responsibilities, especially for Amber. Their relationship has become so toxic that Mother cannot even ask Amber to do simple things such as clear her room or go to bed on time without it ending in a heated argument. Mother admits she has absolutely lost control of Amber.

Moreover, Mother has demonstrated an unwillingness "to facilitate and encourage a close and continuing parent-child relationship between the child[ren and Father]." Mother scheduled Amber's wellness visit with the pediatrician on Father's parenting time during winter break even though Mother has substantially more parenting time than Father. Additionally, Mother has requested a 120-day period during which Father would have very little parenting time and has sought elimination of Father's Thursday parenting time knowing that is music day for the children and Father is very involved in that. Mother asked Father, within earshot of Gwen, if she could keep Gwen another day, even though Father's parents had come down from Michigan to spend a week with Father and the children. When Father said no, Mother turned to Gwen and said, "see, I told you he'd say no." After Gwen had slept in the bed with Mother, who thought she had COVID, Mother insisted on keeping Gwen an extra day even though Father wanted Gwen despite her potential illness. Mother interrupts and interferes with Father's video calls with the children.

As to this factor, Mother again objects to the trial court's emphasis on the deterioration of the relationship between Amber and Mother and her position that the trial court failed to give adequate consideration of Father's "alienating behaviors." Mother specifically addresses the trial court's citation of her scheduling of a wellness visit during Father's parenting time. She argues that this represents "just one (1) occasion in a five (5) year period" when she scheduled a doctor's appointment during Father's parenting time. Mother cites the trial court's comments during the hearing in which the trial court "admonished Father for not taking Amber to the visit." According to Mother's

- 18 -

interpretation, "the court clearly found Father to be the party at fault regarding this incident, but . . . shifted the fault to Mother [in the memorandum and order] for no apparent reason." The trial court did identify the Father's lack of flexibility as to the wellness visit as problematic, stating, "Stuff like that is part of the problem that your whole family has, is having that kind of attitude. You couldn't take a two-hour break from your parents." The court's recognition of Father's contribution to the family dysfunction does not, however, lead to the conclusion suggested by Mother—that Father was "the party at fault regarding this incident." The court cited evidence showing the problematic nature of both parents' attitudes and behavior. The incident about the wellness visit was only one of the examples cited by the court for its conclusion that Mother was less likely than Father to foster a close relationship between the children and both parents. The evidence does not preponderate against this finding.

With respect to factor (3), regarding the parents' attendance at a parent education seminar, the court found no proof. As to factor (4), regarding each parent's disposition to provide the children with food, clothing, and other necessary care, the court found both parents to be "willing and able to provide for the children." Mother does not object to these findings.

Factor (5) concerns "the degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities[.]" *Id.* § 36-6-106(a)(5). Mother argues that the trial court "did not fully embrace this factor favoring Mother." What the trial court found was that Mother had been the children's primary caregiver but that Mother was "no longer able to adequately provide for the children given her hostile relationship with the children, especially Amber." In her argument on this factor, Mother emphasizes Father's repudiation of a mediated parenting plan that would have allowed her to remain the primary residential parent and states that Father's stated reasons for repudiating the plan did not relate to her having the majority of the parenting time. In Mother's view, "the trial court managed to hold Father's repudiation of the parenting plan against Mother, even though it was entirely Father's error that led to the repudiation."

The trial court did not reference Father's repudiation of the mediated parenting plan in its analysis of this factor.[4] The evidence does not preponderate against the trial court's finding that Mother's hostile relationship with the children, particularly Amber, had negatively affected her ability to act as the primary residential parent.

---

[4] In its factual findings, the court credited Father's testimony as to his reasons for repudiating the agreement and found that "the way Mother tried to portray this situation in court is another example of Mother's failure to be candid with the Court."

- 19 -

Factor (6) pertains to "[t]he love, affection, and emotional ties existing between each parent and the child[.]" § 36-6-106(a)(6). The trial court found that the ties between Amber and Mother were "very poor while they are strong between Amber and Father." The trial court further found that, "These ties between Gwen and Mother are strained, primarily because of the poor relationship between Amber and Mother," whereas the ties between Father and Gwen were "good." Mother objects to the trial court's failure to adequately differentiate between Amber and Gwen and argues that the court's finding that "Gwen's relationship with Mother is strained is quite a stretch considering the proof presented at trial, and Mother's unimpeached testimony . . . that Gwen had a better relationship with Mother when Amber was not present."

We agree that the best interests of Amber and Gwen must be considered separately. We do not, however, interpret the trial court's findings on factor (6) to be inconsistent with the undisputed fact that Amber was negatively influencing Gwen's relationship with Mother. The trial court differentiated between the two children, characterizing their relationships with Mother differently: Amber as "very poor" and Gwen as "strained, primarily because of the poor relationship between Amber and Mother." The trial court found that each child's relationship with Father was better than with Mother.

The evidence does not preponderate against the trial court's findings under factor (6) of the best interest analysis.

Factor (7) focuses on "[t]he emotional needs and developmental level of the child[.]" *Id.* § 36-6-106(a)(7). The trial court found that "Amber's emotional needs can be better met by Father" and that, in light of the deterioration in their relationship, "Mother cannot properly provide for Amber's needs." As to Gwen, the trial court found Father was able to meet her needs and that, while the relationship between Mother and Gwen had not yet reached the point where Mother was not able to properly provide for the child's needs, the relationship was "on its way" to that point.

Mother emphasizes the court's findings that Mother's relationship with Gwen had not yet gotten beyond Mother's ability to meet her needs and points out that the trial court did not find a need for Mother to attend counseling with Gwen. Based upon these two aspects of the trial court's decision, Mother argues that the trial court's findings do not support modification of the parenting plan as to Gwen. Of course, the trial court's decision to modify the parenting plan was based on all of its findings with respect to all of the best interest factors. The evidence does not preponderate against the trial court's factual findings under factor (7).

Next, factor (8) concerns "[t]he moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child[.]" *Id.* § 36-6-106(a)(8). The trial court's findings on this factor are as follows:

Mother's lying to Gwen about the COVID shot, lying in court on numerous issues, interfering in the video chats between Father and the children, and reading Amber's diary shows a moral and emotional unfitness that is impacting Mother's ability to parent the children. The caustic relationship between Amber and Mother, which Mother has caused and exacerbated, also shows an emotional unfitness of Mother to parent the children. Father has the moral, physical, mental and emotional fitness to parent both children.

Mother responds as follows:

The COVID shot was given to Gwen on February 10, 2022, and so Gwen would have been eight (8) years old and Amber, twelve (12) years old. Mother compared the situation to when she had previously told the girls they were getting candy instead of medication, with mango and lime flavors. The trial court's finding that Mother was either immoral or not emotionally fit because she told her eight (8) year old that the vaccine was a flu shot, with the doctor's approval, is a finding completely unsupported by the facts. The trial court should have given much greater weight to the fact that Amber, at age twelve (12), was so concerned about the COVID vaccine that she went to the extreme [of] putting a knife to her neck and threatening suicide because Gwen received the shot.

Dr. Berryman testified that the materials Father sent to Amber regarding the COVID vaccine equated to fear mongering, and there should be no doubt based on these facts that Father's influence led to Amber's extraordinary fear of the vaccine. Yet, the trial court finds Father to be entirely moral and emotionally fit.

In considering this factor, the court again referenced the caustic relationship between Amber and Mother but does not adequately differentiate between Amber's relationship and Gwen's relationship with Mother. The court fails to address Father's role in the strain of Mother's relationship with Amber, which has been outlined in detail already herein. This factor should not have favored Father.

(citations to the record omitted).

The trial court based its findings concerning Mother's "moral and emotional unfitness" on multiple examples, most notably its previous determinations that Mother had lied to the court "on numerous issues." While another parent might disagree with the trial court's view of Mother's decision about the COVID vaccination, the trial court's determination concerning Mother's fitness to parent is more than a disagreement regarding parenting styles. As previously discussed, the trial court found Mother to lack credibility

on numerous issues. Similarly, as previously discussed, the trial court placed limited weight upon Dr. Berryman's characterization of the COVID materials as fearmongering and found Father to be more credible than Mother on many issues. The trial court was in the best position to assess the credibility of the witnesses. Without clear and convincing evidence, we are not authorized to question the trial court's credibility findings.

The evidence does not preponderate against the trial court's findings here.

Factor (9) states as follows: "The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities[.]" *Id.* § 36-6-106(a)(9). The trial court found that "Amber has a good relationship with Father's family, her friends, and her teachers" and that "Amber does very well in school, is active in extracurricular activities at school, and is active in music after school." The court found no relevant evidence regarding Gwen. Mother argues that this factor should favor her "as Mother took on the majority of responsibility to ensure Amber participated in extracurricular activities and did well in school." Mother does not cite any testimony or other evidence to support her conclusion. Mother also returns to her arguments that "Father was exerting undue influence over Amber, discussing litigation, counseling, and discovery." The trial court did not find any evidence to support Mother's contentions that Father was turning Amber against her.

Mother further objects to the trial court's failure to consider that, "while Amber and Gwen have a strong relationship, Amber has been manipulative, inappropriate, and overbearing toward Gwen." We agree with Mother that these facts are relevant to this factor. However, elsewhere in the decision, the trial court acknowledged the strained relationship between the siblings and found that, "The family [dysfunction] has adversely impacted the relationship between Amber and Gwen." The evidence does not preponderate against the trial court's findings as to this factor.

Factor (10) relates to "[t]he importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment[.]" *Id.* § 36-6-106(a)(10). The trial court found that "the children have not been in a stable and satisfactory environment at Mother's house in several years." The court found that Father's home was "calm and stable." Mother argues that the trial court failed to consider the issue of continuity and the impact of a change in schools necessitated by a change in custody. She further states:

> [T]he trial court failed to consider [the] stability that Mother did in fact provide as it relates to the children's medical and educational needs. . . . As to both children, Father's counsel stated at trial, "They're doin[g] great in school. They've got – they both seem to have plenty of friends. They're doing – really enjoying their extracurricular activities." Mother was the

primary residential parent responsible for the children's socialization, extracurriculars, and maintaining good grades. By changing custody as to both children, the trial court shifted that responsibility to Father at least to a degree, and the court disregarded the continuity that Mother provided, which led the children to being successful leading up to the date of trial.

(Citation to record omitted). In Mother's view, this factor favors her.

It is true that the trial court did not, on this factor, repeat all of its previous relevant findings or acknowledge Mother's contributions to the children's well-being. However, the best interest analysis necessarily requires the court to compare the parents on each factor, and the court determined that, overall, Father provided the more stable environment for the children. The evidence does not preponderate against the trial court's findings here.

The trial court found factor (11), regarding abuse, not applicable, and Mother does not dispute this finding. Mother also does not dispute the trial court's brief finding under factor (12) regarding Father's girlfriend.

Factor (13) directs courts to consider "[t]he reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children[.]" *Id.* § 36-6-106(a)(13). The trial court found that Amber had "expressed a preference to spend more time with Father and for him to have custody because she feels loved and respected by him" and that Amber did not "want to spend much time with Mother." Mother argues that Amber's preference is not reasonable "considering that significant evidence was presented indicating that Father influenced Amber's preference." Mother then details some of this evidence, including her assertion that Father told Amber that Mother had read her diary and a recorded statement made by Amber, which Mother argues "strongly indicate Father has inappropriate conversation with Amber." However, the trial court heard all of this evidence and found that "there is not sufficient proof to show Father has done anything to turn Amber against Mother."

The trial court found Father and Amber to be more credible witnesses than Mother, and Mother disagrees with these credibility assessments. Mother has not presented this Court with clear and convincing evidence to overcome the trial court's findings concerning her credibility.

The trial court found that both parents had flexible work schedules, so factor (14) did not weigh in either parent's favor.

As previously stated, the trial court's finding as to whether modification of the parenting plan is in a child's best interest is a factual finding subject to the preponderance of the evidence standard of review. *Taylor*, 2025 WL 899792, at *6. Mother argues that

the trial court should have found factors (1), (5), (6), (7), (9), and (10) to favor her with respect to Gwen and factors (1), (5), (9), and (10) to favor her with respect to Amber. Based upon the foregoing analysis of the individual factors, the evidence does not preponderate against the trial court's determination that modification of the parenting plan was in the best interest of both children.

The remaining question is whether the trial court abused its discretion in deciding how to modify the parenting plan. Under the new parenting plan, Father was named the primary residential parent, but the parents have equal parenting time in a week-on/week-off schedule. Our Supreme Court has repeatedly stated that determining the details of parenting plans is "'peculiarly within the broad discretion of the trial judge.'" *Armbrister*, 414 S.W.3d at 693 (quoting *Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1988)). An appellate court's function does not include "'tweak[ing] a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court.'" *Id.* (quoting *Eldridge,* 42 S.W.3d at 88).

Mother's strongest argument is that the trial court should have treated Gwen differently than Amber in light of the differences in their relationships with her and their individual needs. Under Tennessee law, there is a presumption against separating siblings. *King v. Jones*, No. M2020-01252-COA-R3-CV, 2022 WL 2794347, at *6 (Tenn. Ct. App. July 18, 2022); *Shofner v. Shofner*, 181 S.W.3d 703, 717 (Tenn. Ct. App. 2004). Of course, as Mother argues, the best interest of each child remains the primary and controlling consideration. *Strickland v. Strickland*, No. M2012-00603-COA-R3-CV, 2012 WL 6697296, at *14 (Dec. 21, 2012). Given the trial court's factual findings, particularly as to the family dysfunction and the changing needs of both children, we find no abuse of discretion in the trial court's decision to adjust the parenting schedule as to both girls as it did. Mother has not identified any ways in which the trial court's ruling falls outside the range of "rulings that might reasonably result from an application of the correct legal standards to the evidence." *Armbrister*, 414 S.W.3d at 693.

II.     Decision-making authority

Mother challenges the trial court's decision to give Father sole decision-making authority on non-emergency health care issues and educational matters.

Modifying decision-making authority requires a trial court to use the same standards applicable to any parenting plan modification, i.e., the two-step process discussed above of finding a material change in circumstances and then considering the best interest factors. *Smallman v. Smallman*, 689 S.W.3d 845, 861-62 (Tenn. Ct. App. 2023). Since we have already determined that the trial court properly found a material change in circumstances and that modification was in the children's best interest, the sole remaining question is whether the trial court acted within its discretion to change the decision-making authority from Mother to Father for non-emergency medical issues and educational issues.

- 24 -

In changing the decision-making authority on non-emergency medical decisions, the trial court cited "Mother going against Father's wishes and getting Gwen the COVID shot without even discussing the matter with Father, lying to Gwen about it, and then telling Amber about it, which caused Amber to threaten suicide." The trial court gave Father the sole authority on educational decisions "so that he can choose the children's schools." Throughout its decision, the court noted the high degree of family dysfunction and conflict exhibited by Mother and Father and found Mother to be particularly at fault in failing to act in the children's best interest. Mother again argues about the correctness of the trial court's findings regarding COVID, Dr. Berryman's testimony, the roles of the two parents in the incident regarding Mother's scheduling of a wellness visit during Father's parenting time, and the roles of the parents in the children's educational success. We have previously discussed the trial court's findings on these matters.

Tennessee Code Annotated section 36-6-407 addresses the allocation of parenting responsibilities in parenting plans. Section (c) requires a trial court to consider certain criteria in allocating decision-making authority, including the following:

> (2) The history of participation of each parent in decision making in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and whether each parent attended a court-ordered parent education seminar;
> (3) Whether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the child in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion[.]

Tenn. Code Ann. § 36-6-407(c). Mother correctly asserts that, historically, "Father participated very little in comparison to Mother as to both the educational and health related categories."[5] The more salient factor here, however, is that the parents have not "demonstrated the ability and desire to cooperate with one another in decision making regarding" the children, especially in these two areas. Tenn. Code Ann. § 36-6-407(c)(3). Rather, the parents have demonstrated an inability to cooperate in making these decisions, and the trial court clearly found Mother to be particularly at fault in the level of conflict.

We find no abuse of discretion in the trial court's decision regarding decision-making on non-emergency health care and educational matters.

---

[5] Mother also references disputes between the parents that arose after the trial court's decision and the fact that she prevailed on a related post-trial motion. We do not consider these matters relevant to our review of the trial court's decision.

III.    Passports and travel

In the trial court, Mother requested permission to obtain passports for the children so that she could take them to India to visit her mother. The trial court denied Mother's request and ordered that neither party could obtain passports for the children or take them out of the country. In its findings of fact, the trial court made the following pertinent findings:

> Mother claims she is not a flight risk to India with the children because she no longer has a life there – her only relative there is her mother and she has two homes, a job, friends, and her brother here in the United States. Father replies that Mother is indeed a flight risk because she could take the children to India and never return. Father states Mother's mother visits the United States for extended periods of time at least twice a year. Father further points out that Mother's sister lives in India. Father is also fearful of Mother taking the children to India because it is not a safe country, in Father's opinion. Mother's testimony that her only relative in India is her mother knowing her sister lives there as well is yet another example of Mother's dishonesty with the Court.

We will begin by looking at the testimony cited by the trial court as an "example of Mother's dishonesty with the Court":

> Q.  Okay.  Now, of course, the biggest concern for Judge Johnson is going to be are you a flight risk, would you go to India and never come back with these children. Tell me – tell Judge Johnson, why, you know, that's –
>
> A.  I understand the risk. I totally do. I understand Mr. Boatman's perspective on it. And he knows this. He had traveled with me to India himself, and with Amber when she was two years old, a couple of times. I have no intentions to go back. In fact, my brother is here. My only life here. My mom, she visits us when she can, and I visit her. Very frequently I go and come back. I have a home here. I have two homes here. I have a stable job. I have a life that I built and a social network, a social connection. I don't have a life there anymore.

The trial court interpreted Mother's reference to her mother living in India as a statement that her mother was Mother's only relative still living in India and to be inconsistent with the fact that Mother also has a sister living in India. In this instance, however, we find that the actual testimony is not consistent with the trial court's interpretation and does not support the trial court's finding that Mother was being dishonest with the court.

Further, as Mother points out, the Uniform Child Abduction Prevention Act ("the Act"), Tenn. Code Ann. §§ 36-6-601—612, applies here, and the trial court's order does not comply with the requirements of the Act. Under Tenn. Code Ann. § 36-6-604(a), a court "on its own motion may order abduction prevention measures in a child-custody proceeding if the court finds that the evidence establishes a credible risk of abduction of the child." Tennessee Code Annotated section 36-6-607 outlines the evidence to be considered by a court in determining whether there is a credible risk of abduction. Further, Tenn. Code Ann. § 36-6-608 addresses the content of abduction prevention orders and states:

> If, at a hearing on a petition under this part or on the court's own motion, the court after reviewing the evidence finds a credible risk of abduction of the child, the court shall enter an abduction prevention order. The order must include the provisions required by subsection (a) and measures and conditions, including those in subsections (c), (d), and (e), that are reasonably calculated to prevent abduction of the child, giving due consideration to the custody and visitation rights of the parties. The court shall consider the age of the child, the potential harm to the child from an abduction, the legal and practical difficulties of returning the child to the jurisdiction if abducted, and the reasons for the potential abduction, including evidence of domestic violence, stalking, or child abuse or neglect.

Tenn. Code Ann. § 36-6-608(b). The trial court's order does not cite the Act or comply with its provisions concerning abduction prevention orders, including a determination of "a credible risk of abduction."

We conclude that the trial court erred in prohibiting the parties from obtaining passports or traveling with the children outside the country without complying with the Act and reverse that portion of the trial court's decision.

IV.     Holiday parenting time

The trial court ordered: "The summer schedule and any school breaks shall follow this day-to-day schedule. No special exceptions will be made for the various religious holidays, i.e., the day-to-day schedule will apply and the chips will fall where they may." Mother argues that the trial court erred in failing to designate holiday parenting time, and we agree.

Tennessee Code Annotated section 36-6-402(5), which defines terms related to parenting plans, provides as follows:

> [T]he residential schedule must designate a primary residential parent when the child is scheduled to reside with one (1) parent more than fifty percent (50%) of the time; in addition, the residential schedule must designate in

which parent's home each minor child shall reside on given days of the year, including provisions for holidays, birthdays of family members, vacations, and other special occasions, consistent with the criteria of this part;

Thus, a parenting plan must include provisions for holidays. In this case, both parents submitted proposed parenting plans with their preferences concerning parenting time on holidays, including Christian and Hindu holidays. We have determined that the trial court erred by failing to follow the statutory requirement of designating parenting time for holidays. Therefore, we vacate the parenting schedule and remand for the limited purpose of designating the parenting time for holidays.

## V.    Religious upbringing

On the issue of the children's religious upbringing, the trial court's memorandum and order states:

> The parties shall have equal decision-making authority on religious matters and *each party is permitted to engage and encourage the children in the religion of the party's choosing on his or her parenting time.* Neither party shall require the children to practice his or her religion at the other parent's house or on the other parent's parenting time.

(Emphasis added). Mother's argument on appeal arises from the fact that the parenting plan itself contains language that differs from the court's memorandum and order—specifically, the parenting plan does not include the italicized language from the court's order. Mother argues that the parenting plan is "more restrictive in that it would not allow a parent to restrict a child from practicing the other parent's religion during their parenting time." She asks this Court to reverse the trial court and remand on this issue for clarification.

This Court sees no need for clarification regarding the trial court's decision on this issue. Both the trial court's memorandum and order and the parenting plan are orders of the court, and the language omitted from the parenting plan remains binding on the parties. There is no ambiguity or conflict to resolve.

## VI.    Attorney fees awarded by the trial court

Mother argues that the trial court erred in awarding Father $30,000 in attorney fees. An award of attorney fees is reviewed under an abuse of discretion standard. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011).

We will begin with a summary of the relevant procedural history. A few days after the trial court issued its memorandum and order, Husband filed a motion to alter or amend,

pursuant to Tenn. R. Civ. P. 59.04, requesting his attorney fees in the amount of $43,463.65. In support of this motion, Husband submitted affidavits from two attorneys.

Harold Rushton, the attorney who represented Husband previously, did not provide an invoice or a detailed statement of his time spent in the matter. In his affidavit, Mr. Rushton described the work he performed on the case as "moderately complex" and outlined the tasks performed by his office. Mr. Rushton charged an hourly rate of $300 and stated that he spent 71.05 hours of his own time on the case. Mr. Rushton averred that his office had incurred a total of $22,428.90 for work and costs. Father's attorney at trial, Michele McGill, submitted an affidavit and attached an itemized record of her time showing fees and expenses related to the case totaling $23,034.75. Ms. McGill charged an hourly rate of $350.

Mother filed a motion to alter or amend on March 26, 2024, in which she asserted that she had prevailed on "two substantial issues" and Father "only prevailed on one" and that she had incurred $50,392.00 in attorney fees and costs. Mother argued that she should be considered the prevailing party and asked the trial court to amend its previous order to award her reasonable attorney fees or, in the alternative, require each parent to pay his or her own attorney fees. Mother attached an affidavit from her attorney along with a record of his time and costs.[6]

On April 11, 2024, the trial court entered its order regarding attorney fees. The court found that Tenn. Code Ann. § 36-5-103(c)[7] authorized the award of attorney fees to the prevailing party in the litigation, which involved modification of custody, the residential parenting plan, and child support. The trial court determined that Father was the prevailing party in the case for the following reasons:

> The court changes custody of the minor children from Mother to Father. Furthermore, the Court awarded Father substantially more parenting time than he had prior to this litigation. In addition, the Court awarded Father medical and educational decision making. Although Mother prevailed on a

---

[6] A few days later, Mother filed another motion to alter or amend, requesting clarification of the permanent parenting plan regarding the children's medical appointments and the court's ruling that Mother could pursue reunification therapy with Amber. The trial court ruled on this order on May 1, 2024.

[7] Tennessee Code Annotated section 36-5-103(c) states:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

few issues in the litigation, Father prevailed on the majority of the decisions the Court made.

Moreover, Mother was the primary cause for the substantial and material change in circumstances which led to the Court changing custody to Father and altering the parenting plan to give Father more parenting time as well as the medical and educational decision-making authority.

The court also found the requested attorney fees to be necessary and reasonable under the factors in Tennessee Rule of Professional Conduct 1.5(a). On this basis, the court ordered Mother to pay Father $30,000 out of Father's $45,463.65 in attorney fees.

In this appeal, Mother does not challenge the trial court's authority to award attorney fees in this case or its determination concerning the necessity and reasonableness of the attorney fees requested by Father. Moreover, she acknowledges that "Father was the prevailing party as to the custody modification," but emphasizes that Father "did not prevail on his Petition for Criminal Contempt." Mother's argument is that the trial court erred in awarding Father $30,000 of his attorney fees. She argues that the trial court should have awarded her her attorney fees for the criminal contempt petition. Mother also avers that she received relief on more motions leading up to trial than Father.

A trial court's decision to award attorney fees under Tenn. Code Ann. § 36-5-103(c) "is largely within the discretion of the trial court and . . . , absent an abuse of discretion, appellate courts will not interfere with the trial court's finding." *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017). The trial court found Father to be the prevailing party in this litigation, and Mother acknowledges that Father is the prevailing party on the custody modification action, which is the main litigation at issue here. The trial court dismissed Father's contempt petition, as Mother emphasizes. However, the trial court did not award Father his entire attorney fee request of $43,463.65. There is no basis for this Court to find that the trial court abused its discretion in awarding Father $30,000 of his attorney fees.

VII.    Attorney fees on appeal

Mother and Father both request their reasonable attorney fees and costs incurred in this appeal. We decline to exercise our discretion to award either party attorney fees in this appeal.

CONCLUSION

The judgment of the trial court is affirmed in part, reversed in part, and vacated and remanded in part. Costs of this appeal are assessed against the appellant, Karuna Chaudhary, for which execution may issue if necessary.


/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE